THE ATTORNEY–GENERAL *vs.* THE DELAWARE AND BOUND BROOK RAILROAD COMPANY.

1. Where the suit immediately concerns the rights of the state, the information is generally exhibited without a relator.

2. In matters of purely public concern, as where the property of the state, owned by it in its political capacity, or where public rights in which no merely private interest is involved, are in question, the courts are open to the state without requiring security for costs.

3. The Delaware river became, by conquest, the boundary between the States of New Jersey and Pennsylvania; and being such, and the original property being in neither of them, and there being no convention between them in regard to it, when, in 1783, the King of Great Britain relinquished all claims to government, propriety and territorial rights in the United States, each state, by the rule of international law, had dominion to the middle of the stream.

. 4. A river may be navigable below the ebb and flow of the tide in the sense of the common law, and, in fact, navigable above; and the question of boundary in respect to lands adjoining it will be determined by one principle above, and by another below tide water.

VOL. XII. ·          A

5. New Jersey has no *jus privatum* in the soil of the Delaware river above tide water; that is in the riparian owners, subject to the public easement of navigation, and to such regulations by the legislature of the waters as the public right of navigation may require; as to the jurisdiction and power of the state over it, the river above tide water is to be regarded as a navigable stream.

6. The Delaware and Bound Brook Railroad Company, in erecting piers upon the land under water in the Delaware river, to the middle of the stream, for the erection of a viaduct for a railroad track to connect with the track of the North Pennsylvania Railroad Company, have not violated the 36th section of the general railroad law, prohibiting corporations formed under that law from taking any land under water belonging to the state, unless the consent of the riparian commissioners shall first have been obtained.

7. If it be merely doubtful whether there is a purpresture or not, an injunction asked for on the ground of purpresture will not be granted. To warrant an injunction in such case, it must be clear that there is a purpresture.

8. The provision of the compact of 1783, between Pennsylvania and New Jersey, on the subject of fisheries, relates to fisheries below the head of tide water, which were the subject of private ownership and individual occupancy. The right in the riparian owners, of several fishery in front of their lands is distinctly recognized in this state.

9. The objects and purposes of that compact were merely to secure the administration of justice, and to secure to the contracting parties the use of the river as a public highway. The provision for concurrent jurisdiction had reference to the former only; it was a police regulation, merely.

10. The compact of 1783 gives no jurisdiction to Pennsylvania over the soil of the Delaware river within the territorial limits of this state, nor does it confer on her any right therein. It gives her a right to complain of, and to be relieved against, any structure or other occupation of the river on the soil of this state injurious to the free navigation of the river.

11. In an action to remove an erection in a public river, on the ground that it is an injury to the *jus publicum*, the common right of navigation, it must appear that a nuisance, in fact, exists; even though the erection be an encroachment on the soil of the state.

12. The viaduct built by the Delaware and Bound Brook Railroad Company, from the Jersey shore to the middle of the river, to meet part of the same structure built by the North Pennsylvania Railroad Company from the Pennsylvania shore, held to be authorized by the 36th section of the general railroad law, conferring power upon corporations organized under it to build a viaduct "across any navigable or other river, stream or bay in this state."

13. That viaduct *held* not to interfere with the navigation of the river, and not to be a nuisance in fact.

14. That viaduct is not a toll bridge, but merely the railroad connection of two railroads; a highway by railroad, over the river. The company so operating it is not chargeable with a usurpation of a franchise to take tolls.

15. Pennsylvania gave authority to build this bridge by the act of incorporation of the North Pennsylvania Railroad Company, in 1852. New Jersey has acquiesced by her silence in the construction which Pennsylvania thus put upon the compact of 1783.

16. Authority to bridge the river has been given by both states. Long lapse of time between the giving of the consents does not affect it.

17. A doubt as to the authority of a corporation to do an act is fatal to an application for an injunction to restrain such act on the ground of want of authority.

18. Where a party acting *bona fide* and upon its not unreasonable construction of a public grant, has been permitted to expend a large sum of money in the construction of a public work, in the confidence that it possessed all requisite legislative authority, without a word of protest or remonstrance till the work is practically completed, equity will refuse its aid, even to the state, leaving it to its remedy at law.

Motion for injunction. On bill and answer and order to show cause why injunction should not issue.

*Mr. J. Vanatta,* Attorney-General, and *Mr. Cortlandt Parker,* for the motion.

*Mr. A. Browning, Mr. Williamson,* and *Mr. Ashbel Green,* contra.

THE CHANCELLOR.

The information complains that the defendants are constructing a bridge across the Delaware river, and so have been and are guilty of purpresture, and that the structure is a public nuisance. It prays that they may be restrained from erecting or completing it, and from placing or raising its abutments, piers or supports, which, it alleges, are to be placed in the waters of the river, and from using and maintaining the structure, and taking tolls or fares for passing or repassing on or over it; and that it may be declared to be a purpresture and public nuisance, and that the defendants may, by the decree of this court, be ordered to abate so much of it

as shall have been erected before the final hearing, and to
remove the materials from the river. It alleges that the
Delaware is the boundary line between New Jersey and Penn-
sylvania, and is now, and of right always has been, a public
highway in its whole length and breadth, free and common
to the citizens of this and other states, and is navigable for
many purposes of trade and commerce at the point where the
bridge is being erected; that the compact of 1783, between
New Jersey and Pennsylvania, is in full force, and has, ever
since its ratification by the respective legislatures, been in all
respects recognized as binding, and has been observed and
conformed to by the parties to it until its violation and
infringement by the defendants, in erecting the viaduct; that
the defendants claim to have been incorporated under the
general railroad law of this state, and, in their articles of
association, their road is described as beginning at a point in
the boundary line between the States of Pennsylvania and
New Jersey, in the middle of the Delaware river, in the town-
ship of Ewing, in the county of Mercer, in this state, some-
where between an island in the river called Slack's Island,
northward of Yardleyville, in the State of Pennsylvania, and
another island in the river called White's Island, southward
of Yardleyville; and the termination point of the road is in
the southerly line of the railroad of the Central Railroad
Company of New Jersey, at or near the village of Bound
Brook; that the defendants, under pretence of constructing
a railroad according to their articles of association, have com-
menced the erection of the bridge in question across the Dela-
ware (an inter-state river), from a point in the township of
Ewing, in Mercer county, in this state, to a point in the town-
ship of Lower Makefield, in Bucks county, in Pennsylvania,
and that they propose to use it, when finished, for their road;
that they allege that the bridge is part of their road, and that
they intend to charge and receive fares or tolls from persons
using the bridge; whereas the Attorney-General insists that
the bridge is not a part of the road, and that the attempt to
erect the structure, and take tolls for its use, is unlawful. He

also insists that the general railroad law does not, in terms or by implication, confer on the defendants the right to erect any bridge over the Delaware; that the erection and construction of the bridge is a direct and positive infraction of the compact of 1783, between the states, and that the power to erect a bridge over the Delaware can only be conferred by concurrent legislation of both states, and that neither state can, of its own authority, authorize a corporation to place piers, erect a bridge, take tolls, and construct a highway over the river, but such franchise can only be conferred by concurrent legislation; that not only has there been no concurrent legislation in this case, but there has been no grant of the franchise to the defendants from either state; that the grant of the franchise cannot be implied from any act or law of this state, and that the structure, therefore, is without authority of law, and an invasion of the sovereignty of this state, and if the erection and construction be permitted, it will be a purpresture, and will be liable to be abated as such. The information states that the erection of the bridge at the point where it is located will greatly imperil, obstruct, and interrupt the use of the river as a highway, and that the bridge will be a common nuisance to the people of this state. It further alleges that the defendants, on application to them, have refused to remove the structure, or to desist from their purpose of finishing and using it.

The defendants have answered fully. The answer insists, and on the argument it was urged, that the information cannot be maintained in its present form, inasmuch as it is exhibited without a relator. This objection is not well taken. The practice is settled. Where, as in this case, the suit immediately concerns the rights of the state, the information is generally exhibited without a relator. *Laussat's Fonblanque*, *p.* 5, *n; Mitford's Plead., by Jeremy*, 99; 1 *Newland's Prac.* 55; *Blake's Chancery Prac.* 40; *Cooper's Eq.* 101, 102. While in practice it is usual to name a relator, and the contrary course may tend to oppression, since, if there is no relator, the defendant can recover no costs, still in matters of

purely public concern, as where the property of the state, owned by it in its political capacity, or where public rights in which no merely private interest is involved, are in question, the courts are open to the state without requiring security for costs.

The information is filed to remove out of the Delaware the viaduct built by the defendants and the North Pennsylvania Railroad Company, (about one-half by each company), across the river near Yardleyville, above the falls of Trenton, and therefore above tide-water.

The Attorney-General claims that the structure is a purpresture; that it is a public nuisance, and that its maintenance and use for the purposes for which it is designed will be a usurpation of a franchise, and will be a violation of the compact of 1783, between this state and Pennsylvania. The defendants, on the other hand, allege that the land on which the viaduct is built is not the property of the state, but is private property; that, by the provisions of the general railroad law, under which they were incorporated, they are authorized to construct the bridge in question, and that its erection and maintenance are no violation of the compact, and that consent to its erection has been given by the State of Pennsylvania.

The royal charters for the territories in which what are now the States of New Jersey and Pennsylvania were embraced, bounded them on the Delaware; that in which this state was included, by "the east side" of the river, and the other, "on the east" by the river. The crown was advised in 1721 that these grants did not include the river, or any part of it, or the islands therein, and that the right to them remained in the crown. *Chalmers' Opinions* 90. By the treaty of peace between the United States and the King of Great Britain, in 1783, the latter relinquished all claims to government, propriety and territorial rights in the former. The consequence was that the river became, by conquest, the boundary between the states; and being such, and the original property being in neither of them, and there being then no

convention between them in regard to it, each state, by the rule of international law, had dominion to the middle of the stream. At the close of the Revolution, the common law of England was in force in this state; for, by the constitution of July 2d, 1776, it was provided that that law should remain in force in New Jersey, until altered by the legislature. By the common law, the ownership of the soil of all rivers not navigable, that is, in which the tide does not ebb and flow, is in the riparian owners. In the case of public rivers which, though not navigable in the common law sense of the term, are, nevertheless, navigable in fact, the ownership of the soil is in the riparian owners, subject to the public right of navigation. And so, too, though the river be declared (as was the Delaware, by act of the colonial legislature of New Jersey in 1771, [*Allinson's Laws* 347] and the compact between this state and Pennsylvania in 1783) to be a public or common highway. *Juxon* v. *Thornhill, Cro. Car.* 132; *Hale's De Jure Maris, c.* 3; *Harg. Law Tracts, p.* 9; *Lord Fitzwalter's case,* 1 *Mod.* 105; 3 *Kent's Com.* 427; *Angell on Watercourses,* §§ 535, 545. It has been held, even in the case of the great river Mississippi, that the common law, and not the civil law, governs; that that river, above the ebb and flow of the tide, is not navigable in the common law sense of the term, and that the riparian owner owns the soil to the middle of the river; and further, that the act of Congress establishing the river as the western boundary of the Mississippi territory, and adopting the common law for the government of that territory, fixed the boundary line at the middle of the river, and that, therefore, the right of riparian owners on the east side of the Mississippi must be determined by the common law; and still further, that their rights to the soil of the river, or to the use of the bank, are not affected by the fact that the act of Congress makes the river a common highway, free to every citizen without tax or duty. *Morgan* v. *Reading,* 3 *S. and M.* 366; *Magnolia* v. *Marshall,* 39 *Miss.* 110. In Ohio it has been adjudged that the ordinance of 1787, for the government of the North Western territory, which declares

that the navigable waters leading into the Mississippi shall be common highways, and forever free, does not prevent the application of the common law principle that he who owns the bank owns to the middle of the river, subject to the easement of navigation. *Adms. of Gavit* v. *Chambers,* 3 *Ohio* 495. See, also, *Middleton* v. *Pritchard,* 3 *Scammon* 510. A river may be navigable below the ebb and flow of the tide, in the sense of the common law, and, in fact, navigable above, and the question of boundary in respect to lands adjoining it will be determined by one principle above and another below tide-water. Though, in some of the United States, (among them Pennsylvania), the civil law doctrine as to the ownership of the soil has been adopted as to great rivers not navigable in the common law sense, in many of them the common law doctrine governs the subject. It governs it here. *Arnold* v. *Mundy,* 1 *Halst.* 1 ; *Gough* v. *Bell,* 2 *Zab.* 441 ; *Bell* v. *Gough,* 3 *Zab.* 624 ; *Martin* v. *Waddell,* 3 *Harr.* 495 ; *Rundle* v. *Del. and Rar. Can. Co.,* 1 *Wall., Jr.,* 275. In the last case it was applied to the Delaware. The court there said : "The river Delaware is the boundary between the States of Pennsylvania and New Jersey. The tide ebbs and flows to the part of the Trenton Falls where the Trenton bridge crosses the river ; above that point it is a fresh water stream. Previous to the Revolution, the channel and waters of the river below Trenton, so far as the river was navigable, in the common law sense of the term, were vested in the King of England. The grant, both for New Jersey and for Pennsylvania, was bounded by the river Delaware. So far as the tide ebbed and flowed, the proprietors had no title to the bottom of the river below low water mark. But above the bridge and the flow of the tide, the proprietors of each province held *ad filum medium aquæ,* by the established principles of the common law, according to which their respective grants must be construed. So far as the river was the property of the crown, it devolved on the two states by the Revolution and the treaty of peace with Great Britain. Immediately after the treaty of peace, the States of Pennsylvania and New Jersey entered into

the compact of April, 1783, making the Delaware a common highway for the use of the states." See, also, *S. C.,* 14 *How.* 80.

The state has no *jus privatum* in the soil of the Delaware above tide-water; that is in the riparian owners, subject to the public easement of navigation, and to such regulation by the legislature of the waters as the public right of navigation may require. The right of the riparian owners to the soil of the river is subordinate to the right and power of the state to use and appropriate the river to the public good in promotion of navigation; and, as to the jurisdiction and power of the state over it, the river above tide water is to be regarded as a navigable stream. *Vattell, Book* 1, §§ 249, 272; *Binney's Case,* 2 *Bland* 99; *Commissioners of Homochitto River* v. *Withers,* 29 *Miss.* 21; *Woolrych on Waters* 46.

There is, therefore, in this case, no purpresture, and the defendants have not violated the proviso of the thirty-sixth section of the general railroad law, which prohibits corporations formed under that law from taking any land under water belonging to the state, unless the consent of the riparian commissioners shall first have been obtained.

But if it be merely doubtful whether there is a purpresture or not, an injunction asked for on the ground of purpresture will not be granted; for, to warrant an injunction in such case, it must be clear that there is a purpresture. *Story's Eq. Juris.,* § 924 *a; City of Rochester* v. *Curtiss, Clarke* 343.

It is argued on behalf of the state, that this view of the ownership of the soil of the river will give to the riparian owner the right of fishery in front of his land, and that the terms of the compact of 1783, between this state and Pennsylvania, forbid such construction. The provision of the compact, on the subject of fisheries, is that " each of the legislatures of said states shall hold and exercise the right of regulating and guarding the fisheries in the said river .Delaware, annexed to their respective shores, in such manner that the said fisheries may not be unnecessarily interrupted during the season for catching shad, by vessels riding at anchor on the fishing ground, or by persons fishing under a claim of

common right on said river." In *Gough* v. *Bell*, 2 *Zab.* 441, 462, Chief Justice Green, referring to this provision of the compact, says, that the act of June 13th, 1799, (*Pat.* 416, § 9,) shows clearly that the legislature of this state understood this clause of the compact of 1783 as relating to fisheries below the head of tide-water, which were the subject of private ownership and individual occupancy ; and he adds, that the rights of the riparian proprietors to fisheries in the Delaware are also clearly recognized by the acts of November 26th, 1808, (*Bloomfield* 204,) of February 9th, 1819, (*Rev. Laws* 653,) of February 15th, 1819, (*Rev. Laws* 659,) and the laws of November 26th, 1808, (*Rev. Stat.* 480,) and the act of December 27th, 1826, (*Rev. Stat.* 479); and he says, " such repeated and unequivocal legislative recognitions of a right furnish proof of its existence which cannot be disregarded." The act of 1799, above referred to, provides for the regulation of fisheries in the Delaware, between the falls at Trenton and the mouth of the Machacomack river, which is near the north station.   It appoints commissioners to grant licenses to erect wiers, fishing dams, pounds and baskets in the Delaware ; but provides that no license shall be granted to erect any wier, rack, fishing dam, pound or basket opposite to or adjoining the land of any person without his or her consent in writing, previously obtained, thus distinctly recognizing the right of several fishery in the riparian owners.

I proceed to consider the subject in the light of the obligations of this state to Pennsylvania, under the compact of 1783. The theory of joint ownership by New Jersey and Pennsylvania of the entire river, asserted on behalf of the state in this case, is by no means a new one.   It was advanced by Pennsylvania many years ago, and stoutly resisted by this state. It has not only never been assented to by New Jersey, but the practice of both states is opposed to it.   Since the compact of 1783 was made, the citizens of Pennsylvania have, both with and without the sanction of her legislature, and without receiving or asking the consent of this state, erected wing-dams and other structures in the river on her side.   In

like manner our citizens have occupied the soil of the river on our side, and each state has withdrawn, without the consent of the other, the water from the river for the purpose of artificial navigation. The requirements of the administration of justice, and the necessity of providing for the protection of the navigation of the river, gave rise to the compact. These, and these alone, were the objects of it. This appears both from the preamble and the provisions of the compact. The following are the preamble and the first and second sections: "Whereas, inconveniences and mischiefs have arisen, and may hereafter arise, from the uncertainty of jurisdiction within and on the river Delaware; therefore, to prevent the same, and in order that law and justice may hereafter in all cases be executed and take effect within and upon the said river, from shore to shore, in all parts and places thereof, where the said river is the boundary between the said states, the said commissioners do agree and establish, for and in behalf of their respective states, in manner following, that is to say: First—It is declared that the river Delaware, from the station point on the northwest corner of New Jersey, southerly to the place upon said river where the circular boundary of the State of Delaware toucheth upon the same, in the whole length and breadth thereof, is, and shall continue to be and remain a public highway, equally free and open for the use, benefit and advantage of the said contracting parties; provided, nevertheless, that each of the legislatures of said states shall hold and exercise the right of regulating and guarding the fisheries on the said river Delaware, annexed to their respective shores, in such manner that the said fisheries may not be unnecessarily interrupted during the season for catching shad, by vessels riding at anchor on the fishing ground, or by persons fishing under claim of a common right on said river. Secondly—That each state shall enjoy and exercise a concurrent jurisdiction within and upon the water, and not upon the dry land, between the shores of said river; but, in such sort, nevertheless, that every ship, and other vessel, while riding at anchor before any city or town, in either

state, where she hath last laded or unladed, or where it is in-
tended she shall first thereafter either lade or unlade, shall be
considered exclusively within the jurisdiction of such state;
and every vessel fastened to or aground on the shore of either
state, shall in like manner be considered exclusively within
the jurisdiction of such state; but that all capital and other
offences, trespasses or damages committed on said river, the
judicial investigation and determination thereof shall be ex-
clusively vested in the state wherein the offender, or person
charged with such offence, shall be first apprehended, arrested
or prosecuted." The third section provides that all islands,
islets and insulated dry land within the bed and between the
shores of the river, and between the above mentioned station
point northerly, and the falls of Trenton southerly, shall, as
to jurisdiction, be deemed and considered as parts and parcels
of the state to which such insulated dry land lay nearest at
the time of making the compact; and that certain designated
islands, below the falls, shall be annexed to and be parts of
this state, and that other designated islands shall be annexed
to and be part of Pennsylvania; and that all islands below
the falls shall be annexed to and be part of the state nearest
which they, at the time of making the compact, lay; and so
of islands which might thereafter be formed in the river.
The last section provides for the ratification of the compact
by the legislatures of the states, and that when so ratified it
shall be forever irrevocable, except by mutual concurrence.

By act of the 26th of November, 1783, the islands in
the Delaware belonging to this state were annexed to the re-
spective counties and townships nearest which they lay, except
Petty's Island, which was annexed to Newton township, in
Gloucester county. *Paterson's L., p.* 50. In 1817, differ-
ences arose between the states in regard to wing-dams and
obstructions placed in the river on the New Jersey side by
riparian owners, of which Pennsylvania complained on the
ground that they were injurious to the navigation. The re-
port of a committee of the General Assembly of this state to
that body on the subject, is evidence of the construction which

had been put upon the compact of 1783. It was presented by the chairman, Isaac H. Williamson, and it distinctly asserts the right of each state to authorize, without the concurrence of the other, the erection of mills and wing-dams on its own shores, and within its own jurisdiction, not injurious to' navigation. *Min. of Assembly of* 1817. And still further, the commissioners appointed by this state to settle, in conjunction with those appointed by Pennsylvania, the differences above mentioned, were William S. Pennington, David Thompson and Elliot Tucker. In their first written communication, dated September 15th, 1817, to the commissioners of Pennsylvania, they say: "It appears to us that the respective legislatures of Pennsylvania and New Jersey, notwithstanding the agreement of 1783, have a right to give their assent to, and to regulate by law, the erection, on their respective shores, of all useful piers, docks, wharves, banks, and even mill-dams, or other buildings for the beneficial use of the respective shores; but that in the exercise of this authority they are bound, as well by public law as by the agreement of 1783, to preserve the navigation of the river. We consider the agreement of 1783 nothing more than a declaration that the river Delaware, within the limits prescribed, then was, and should continue to be, a public navigable river, in contradistinction to a private river, and that it must be subject to the same law as all other public navigable rivers that are deemed public highways. We apprehend it to be a mistaken opinion, however extensively it may have spread itself, that the whole bed of the river is sacred, and cannot be touched without a violation of the rights of the states we represent. The soil of the river to the midway thereof, at least at and above the falls of Trenton, if not below, is vested by law in the owners of the adjoining land. It is true the same principle of law that vests this private right in the owners of the adjacent soil, also vests in the public the rights of unobstructed navigation. We admit that this private right must be so exercised as not to injure the public right of navigation. It is not every erection on the bed of the river that becomes a nuisance, and is to be.

construed as a violation of the agreement of 1783; if this was the case, all the piers and docks erected in the river must be destroyed. Docks and wharves judiciously placed on the river, are useful to commerce; in which case they are innocent and lawful erections. But, should they become so far extended as to obstruct navigation, they would become public nuisances, be unlawful, and liable to prostration. We apply the same reasoning to mill-dams, and other erections on the river. Their lawfulness or unlawfulness depends on the fact whether they are or are not obstructions to navigation. We have been more particular in disclosing our opinions on this head, that we might, at one view, enable you to understand the reasoning that led to certain legislative acts of New Jersey relative to wing-dams."

The commissioners close a subsequent communication to the commissioners of Pennsylvania, dated September 17th, 1817, as follows: "Whether the English doctrine, conferring the bed of the river to the middle thereof, on the owners of the adjacent soil, is adopted in this country or not, is a question wholly immaterial in the present inquiry. Whether it is in the owners of the adjoining land, the representatives of the original proprietors, or the state, is a question to be settled in each state by the laws thereof, and has no bearing on the subject under investigation. It is sufficient that it is in one or another of them. We contend that the agreement of 1783 did not touch the soil, but was confined to questions of jurisdiction and navigation, and that the bed of the Delaware river to the midway thereof, from the first settlement of the country to this hour, has belonged to the State of New Jersey, or some of the citizens thereof, and that the Commonwealth of Pennsylvania never had, and, as we believe, never pretended to have any title thereto."

It appears from these public documents, which respectively have the sanction of two eminent names of the past generation, the first Governor Pennington and Governor Williamson, that thirty-five years after the making of the compact, the theory of joint ownership of the river was not entertained by

this state, and was not regarded as an implication from the compact. It has never been recognized since then. The act of March 1st, 1820, to "prevent obstructions to the navigation of the river Delaware," (*Rev. L.* 708,) cited in support of it, does not recognize it. The objects and purposes of the compact were merely to secure the administration of justice, and to secure to the contracting parties the use of the river as a public highway. The provision for concurrent jurisdiction had reference to the former only. It was a police regulation merely, and gave to neither of the states any dominion or authority whatever over, or right in, or control of, that part of the soil of the river which, by the law of nations, belonged to the other. The construction put by the Court of Appeals of New York, in *The People* v. *The Central Railroad Co. of New Jersey,* 42 *N. Y. R.* 283, upon the compact made in 1833, between this state and the State of New York, (*Nix. Dig.* 965,) is in point. By the third article of that compact it was declared that New York should have and enjoy exclusive jurisdiction of and over all the waters of Hudson river lying west of Manhattan Island, and to the south of the mouth of Spuytenduyvel creek, and of and over the lands covered by the said waters, to the low water mark on the westerly or New Jersey side thereof, subject to certain designated rights of property and jurisdiction of New Jersey, among which was the exclusive right of property in the land under water lying west of the middle of the bay of New York, and west of the middle of that part of Hudson river which lies between Manhattan Island and New Jersey, and exclusive jurisdiction of and over the wharves, docks, and improvements made, or to be made, on the shore of this state, and of and over all vessels aground on the shore, or fastened to any such wharf or dock, except that such vessels were to be subject to the quarantine or health laws of New York. The suit was brought by the Attorney-General, in behalf of the state, to abate as nuisances, and cause the removal of certain wharves, bulkheads, piers, and railroad tracks, and other erections which the defendants had placed in the harbor of New York, and extending into

the harbor and the Hudson river about a mile from the New Jersey shore. The complaint claimed that the erections were within the limits and jurisdiction of New York, and were an obstruction to navigation, and injurious to the public health, and were constructed without lawful authority. They were all placed on the west of the designated boundary line. It was held that the jurisdiction conferred upon New York over the waters of the river and bay was a qualified and limited jurisdiction, for police and sanitary purposes, and to promote the interests of commerce in the use and navigation of those waters, and was not designed to confer or create control over the lands or domains of New Jersey, or to give to New York any right to interfere with the complete political or governmental jurisdiction of this state, as a sovereign state, of and over her own soil, and its appurtenances, and of and over every description of property of any appreciable value, within her territorial limits.

The appositeness of the conclusion expressed in that case to the case now under consideration, will be all the more noticeable when it is observed that by the compact just referred to, *exclusive* jurisdiction was given to New York, not only over the waters, *but over the lands covered by the waters*, while, by the compact with Pennsylvania, *concurrent* jurisdiction is given to the contracting parties, and such jurisdiction is *expressly confined to the waters*.

The compact of March 28th, 1785, between Maryland and Virginia, among other things, provides that the Potomac river shall be considered as a common highway for the purposes of navigation and commerce to the citizens of those states, and of the United States, and to all other persons in amity with Maryland and Virginia, trading to or from either of those states ; and it establishes concurrent jurisdiction in those states over that river, and provides for concurrent legislation ; also for the preservation of fish, and for the performance of quarantine, and keeping open the channel and navigation by preventing the throwing out of ballast, or making any other obstruction. *Laws of Maryland,* 1785, c. 1. It has been held

that the compact was confined exclusively to matters of juris-diction and navigation, and left the territorial rights of the parties to it untouched. *Binney's Case,* 2 *Bland* 99, 126, 127.

The compact of 1783 gives no jurisdiction to Pennsylvania over the soil of the Delaware within the territorial limits of this state, nor does it confer on her any right therein. It gives her a right to complain of, and be relieved against, any structure or other occupation of the river on the soil of this state injurious to the free navigation of the river.

But it is insisted that the bridge is at least an unauthorized erection in a public highway, and is therefore a public nui-sance, and that it is a public nuisance in fact, because it will interfere with the navigation of the river. In an action to remove an erection in a public river, on the ground that it is an injury to the *jus publicum,* the common right of navigation, it must appear that a nuisance in fact exists; even though the erection be an encroachment on the soil of the sovereign. *Hale De Portibus Maris, chap.* 7; *Harg. Law Tracts,* 85. The case of *The People* v. *Vanderbilt,* 26 *N. Y.* 287, which was much relied upon by the state on the argument of this motion, was a case of purpresture on the soil of the state in the harbor of New York. The case of *The City of Rochester* v. *Erickson,* 46 *Barb.* 92, cited on the part of the state, was an action for a perpetual injunction to restrain the defendant from erecting a foundation wall necessary for the support of his building, situated in Rochester, on the bank of the Genesee river, on the ground that the building projected into the channel of the river, and interrupted the natural flow of the water in time of floods, contributing to the overflow of the water at such seasons into the streets of the city, and was a public nuisance. The decision is put upon the ground of nuisance. In *City of Rochester* v. *Curtiss, Clarke* 343, (1840), an application for an injunction, under similar circum-stances, was denied on the ground that, as the abutment of the bridge across the river then stood, the structure complained of in that case, though in the stream, was no nuisance. In 1866, when City of Rochester *v.* Erickson was decided, the

bridge had been rebuilt, and the abutment did not project so far into the stream.

What injury, impediment or obstruction to navigation will be occasioned by this viaduct? There are above and below it, between Easton and the falls at Trenton, thirteen bridges. The height of piers and the space between piers of each of them are less than those of this structure. The greatest height of piers in any of those bridges is thirty-eight feet, while the height of the piers of this is forty. The greatest space between piers in those bridges is one hundred and ninety-two feet. In this the space is one hundred and ninety-three. The answer states that, in the erection of the viaduct, scrupulous care has been exercised against impairing the little navigation of which the river is at that point susceptible, and also in reference to all other public rights of the river; that it is constructed as nearly as may be at right angles to the river and its current there; and that the piers are so shaped and constructed as to occasion the least possible impediment to the passage of ice, rafts, scows, boats and other vessels that do now, or may by possibility in the future, navigate the river there. That the navigability of the river is limited, appears by the qualification in the statement of the information on the subject, that the river is navigable "for many purposes of trade and commerce" at the point where the viaduct is. It appears from the affidavits annexed to the answer, that the river at that point is floatable for rafts only at high stages of the water when the river is swollen by freshets or rains, and that then and at other times it is navigable by craft drawing only from six to eighteen inches of water, and that this navigation is now, and for from fifteen to twenty years past has been, confined to small scows employed in gathering cobble or paving stones, and small batteaux, skiffs, and other small boats. To none of this navigation have the existing bridges proved any obstruction. Obviously, the viaduct which affords more room for passage under it than any of them, cannot be regarded as a nuisance in fact. It adds no impediment to the navigation, nor does it create or increase any difficulty therein.

It is insisted on behalf of the state that the viaduct has been erected without authority, and that the use of it, and taking tolls or fares for the use of it, are a usurpation of franchise which it is the duty of this court to restrain. The viaduct will occasion no injury to the public, and the application is on behalf of the state alone. It is not alleged by the state that any private interest whatever, under any franchise granted by the state, is involved. It may well be left to the courts of law to determine whether, in building the viaduct, the defendants have been guilty of usurpation or not. But, are they, in fact, guilty of usurpation? Their viaduct is not a toll bridge. It is merely the railroad connection of two railroads; a highway by railroad over the river. *The Proprietors of the Bridges over the Rivers Passaic and Hackensack* v. *The Hoboken Land and Improvement Co.*, 2 *Beas.* 81; *S. C., on appeal, Ib.* 503. As was said by Chancellor Green in his opinion in that case, (2 *Beas.* 94): The defendants' structure is not a toll bridge. They have no franchise of taking tolls. They have no right to charge for crossing the river any more than if it were not in existence. The structure which they are erecting is not a mere connection between the opposite shores; it is part of an extended line of railway connecting distant points, over which the defendants are to transport passengers at a stipulated rate. Its character and purpose are, in fact, essentially different from those of a bridge used merely as a connecting link for the transfer of passengers between the opposite shores of the river. See, also, *S. C.*, 1 *Wall.* 116. The defendants cannot, therefore, be chargeable with the usurpation of a franchise to take tolls. Is the viaduct unauthorized? They are duly incorporated under the general railroad law. That law provides (§ 23), that companies whose roads shall be constructed under the provisions of that act, shall have the right to connect their roads with any railroad within this or any other state, and (§ 36), that it shall be lawful for any company incorporated under that act to build viaducts over any navigable or other river, stream or bay of water which such railroad may cross. It provides

also that the second section of the "act to prevent accidents
on railways" shall not be considered to extend to or affect in
any way or manner corporations which may be formed under
the general railroad act. The second section of the act to
prevent accidents on railways is (*Pamph. L.*, 1869, *p.* 807):
"That hereafter no railroad shall be laid upon any bridge
across the Delaware river intended for public travel, unless
special authority for that purpose be given by legislative act,
particularly designating the bridge to be subjected to such
use." That the legislature did not intend to except from the
powers conferred upon the corporations organized under the
general railroad law the power to make connection with rail-
roads across the Delaware by means of bridging the river, is
evident from the fact that no such exception is made from the
general grant of power to connect with railroads in other
states, and to bridge any navigable or other river, stream or
bay in this state. It also appears from the fact of the repeal,
so far as corporations under the general railroad law are con-
cerned, of the second section of the act to prevent accidents on
railways, which has reference only to bridges across the Dela-
ware. That this second section might not prove an impedi-
ment to a connection with a railway in Pennsylvania by
preventing the acquisition of a turnpike bridge already in
existence by a railroad company organized under the general
law, the legislature repealed it, so far as such companies are
concerned. That they contemplated the connection of rail-
roads under the general law, with railroads in Pennsylvania,
by viaducts across the Delaware, is too clear for question.
But it is argued that the power to build a viaduct "across
any navigable or other river, stream or bay in this state,"
does not confer the power to build one in the river on the
New Jersey side, to the boundary line between the states. I
do not concur in that view. The act gives the power to cross
the river; impliedly provided the consent of Pennsylvania be
obtained; for, unless such consent be obtained, inasmuch as
this state cannot authorize the occupation of soil belonging to
Pennsylvania, the grant is of no practical use. The grant,

therefore, does not differ practically from those made by the legislature of both states in various charters authorizing structures across the river; as for example, the grant to the Morris Canal and Banking Company by this state, (*Pamph. L.*, 1849, *p.* 35,) by which that company was empowered to erect and construct either a bridge or aqueduct across the Delaware, provided that the erection should be so constructed as not to interfere unnecessarily with the navigation or fisheries, and provided also that the grant should not take effect until a similar power was conferred on the company by Pennsylvania. So, too, the charter of the Alexandria Delaware Bridge Company (*Pamph. L.*, 1841, *p.* 70,) gives power to bridge the river on the like condition.

The states, as before remarked, have not acted upon the doctrine that the consent of both is required to erections on the soil of the river not designed to cross the river or to occupy other soil than their own; as the dams before spoken of erected on each side, with and without the consent of the legislature of the state on whose side of the river they are constructed, and without the consent of the other state, abundantly testify. If the doctrine advanced and contended for in this case on the part of the state is correct, each of those erections was a violation of the compact, but that has never been conceded. When Pennsylvania complained of the wing-dams, in 1817, it was because they interfered, as she insisted, with navigation. If she complained because they were erected without her consent, her claim to consideration and redress on that, as a substantive ground, irrespective of the alleged injury to navigation, was not admitted, as has been already shown. The compact provides for concurrent jurisdiction, not for mutual sovereignty, and the jurisdiction conferred by it is a mutual concession, and does not extend beyond the terms and necessary implications of the agreement.

But in the case in hand, I am of opinion that there has been what is equivalent to, and may properly be regarded as concurrent legislation of the states. The State of Pennsylvania, in 1852, granted to the corporation now known as the

North Pennsylvania Railroad Company, (then called the Philadelphia, Easton, and Water Gap Railroad Company), power to maintain and operate a railroad from a point north of Vine street, in the county of Philadelphia, by the most expedient and practicable route, to near the borough of Easton, or some other point in Northampton county, and to " connect their railroad, by lateral or branch roads, with any railroad constructed, or to be constructed, in any of the counties through which the same might pass; and also to construct one or more bridges across the river Delaware, and to connect by one or more lateral or branch roads, with any railroad, or other public improvement in the State of New Jersey." *Pamph. L. of Penn.*, 1852, *p.* 654. This grant, it may be remarked, is evidence of the construction which Pennsylvania put upon the compact. In this, as in the erection of wing-dams in the river without the consent of this state, and in like manner withdrawing the water of the river for the purposes of her canal navigation, Pennsylvania has given a practical construction to the compact which conclusively establishes against her the right of this state to do the like acts without her concurrence. This grant does not make concurrent legislation, or any legislation, or any consent on the part of this state, a condition precedent to its operation, but it gives to the company, absolutely, leave to bridge the river, not by one bridge merely, but by one or more. The North Pennsylvania Railroad Company, shortly after the passage of that act, under the power granted to them, constructed, and have ever since maintained and operated a main line or trunk railroad from Philadelphia to Bethlehem; and about the time when the defendants were incorporated, they located a lateral branch railroad, called the Delaware River Branch, from a point in their main road, at the Jenkintown station, in a northerly direction through the counties of Montgomery and Bucks, to the line between this state and Pennsylvania, in the middle of the river, in the township of Lower Makefield, in Bucks county, immediately adjoining the state boundary line in the river where the defendants' road begins; and they pro-

ceeded to construct their road, and have constructed their viaduct in the river to the boundary line. So that, of the bridge complained of in this suit, one-half, or thereabouts, was constructed by them under their grant from Pennsylvania, and the rest by the defendants, under their powers claimed under the general railroad law. Pennsylvania, so far as she is concerned, gave by this legislation in favor of the North Pennsylvania Railroad Company, express authority to bridge the Delaware, and New Jersey has acquiesced in the construction which Pennsylvania thus put upon the contract, and has acquiesced in the action of the North Pennsylvania Railroad Company in erecting their part of the viaduct under that authority, for she has not even protested against either. To make the grant available, the consent of New Jersey was requisite, for until that was obtained the railroad company could not build beyond the boundary line. New Jersey gave, by her general railroad law, power to the defendants to connect their railroad with any other railroad out of this state, and to that end to cross any navigable or other river, and that power of itself implied and included authority, so far as the state could give it, to bridge the river for that purpose. *Att'y-Gen.* v. *Stevens, Saxt.* 369; *Peavey* v. *Calais R. R. Co.*, 1 *Am. Railway Cases* 147; 1 *Redfield on Railways* 341. The legislature of each state conferred on the company chartered by it, the requisite power, so far as it could give it. And these grants are respectively valid to that extent. As the grant of the franchise of a ferry over an inter-state river by one of the states alone, is not void for want of the consent of the other, but is good so far as it goes, so here the grant is valid to the extent of the power of the state which makes it, and to that extent is complete. In *Conway* v. *Taylor's Ex'r*, 1 *Black* 603, it was held that the concurrent action of both states is not necessary to the grant of a ferry franchise over a river that divides them. See, also, *People* v. *Babcock*, 11 *Wend.* 590. Each state, then, has given consent to the bridging of the river by these companies. Nor does it matter by what length of time the consents are separated. The authority

·to construct the viaduct is complete. But were it otherwise, Pennsylvania does not, and cannot, complain of the structure, for she surely authorized its erection. One-half of the viaduct stands in its place in the river by her express leave and authority, given more than twenty years ago. There is, therefore, no occasion for New Jersey to complain of it on the ground that it is a violation of the compact of 1783. Nor, it may be remarked, could this court, in the exercise of its power, reach that part of the bridge which stands on the Pennsylvania side of the river. It is beyond its jurisdiction. Surely, it would not be contended, (though the prayer of the information has that aspect), that this court has jurisdiction to decree the prostration of the part of the bridge which is west of the middle of the river. That is within the domain of Pennsylvania. If this court possesses such jurisdiction, the courts of Pennsylvania have it also, as to structures erected in the river on this side of the middle line. No such conflict of jurisdiction exists. The claim of concurrent jurisdiction surely would not be urged to that extent.

But if there be doubt as to the authority claimed by the defendants under the act, the fact of the existence of such doubt would be fatal to the application for injunction on the ground of want of such authority. *Hackensack Improvement Commission* v. *N. J. Midland R. R. Co.*, 7 *C. E. Green* 94; *Scudder* v. *Trenton Del. Falls Co.*, *Saxt.* 694.

There is still another consideration constraining me to the conclusion at which I have arrived. The defendants have acted *bona fide*, under what they believed to be sufficient legislative authority. They have expended a very large sum of money in their enterprise. It appears by the answer that the estimated cost of their railroad, including viaduct and right of way, is nearly two millions of dollars, of which a million and a quarter have been actually paid on account of the work, and for the balance of the work, to cost nearly six hundred thousand dollars, contracts have been made on which they are liable. At the time of filing the information, the North Pennsylvania Railroad Company had expended on their part of the

enterprise nearly a million and a quarter of dollars, making an aggregate of expenditures, by them and the defendants, of about two millions and a half, of which about three hundred and thirty-seven thousand dollars were expended on the viaduct alone. The information was not filed until nearly a year after the construction of the viaduct was commenced, and not until it and the road were almost completed, and no excuse is given for the delay. The state authorities must have been aware of the circumstances, of the great cost of the work, of its vital importance to the enterprises of which it was part, and of the great expenditure made upon them. The locality of the viaduct is near the capital of the state. The legislature has had its usual annual session of many weeks, since the work on the viaduct was begun. The work has been, from its commencement, a matter of public notoriety, and yet no action has been taken on the part of the state authorities, nor even any warning uttered by them against the work. The defendants have been permitted to make their immense expenditure upon their enterprise, in the confidence of their convictions that they possessed all requisite legislative authority, without even a word of protest or remonstrance. Under such circumstances, equity will refuse its aid, even to the state, leaving it to its remedy at law. *Att'y-Gen.* v. *Heishon,* 3 *C. E. Green* 410; *Scudder* v. *Trenton Del. Falls Co., Saxt.* 694; *Att'y-Gen.* v. *Johnson,* 2 *Wilson C. R.* 87; *Att'y-Gen.* v. *Sheffield Gas Co.,* 3 *D., M. & G.* 304; *Att'y-Gen.* v. *N. Y. & L. B. R. R. Co.,* 9 *C. E. Green* 49; *Att'y-Gen.* v. *Brown,* 9 *C. E. Green* 91; *Kerr on Injunctions* 202–206; *Joyce on Injunctions* 1264.

In Attorney-General *v.* Johnson, which was a proceeding to restrain a purpresture in the river Thames, delay in the proceedings, on the part of those who sought the aid of the court, was recognized as a reason which would prevent the court from interposing, and induce it to leave them, as in other cases, to deal with it at law. A court of equity exercises its restraining power in cases of nuisance with great caution. "Its jurisdiction," says the Court of Appeals of this state, in

*Carlisle* v. *Cooper*, 6 *C. E. Green* 576, " over the subject matter is not an original jurisdiction. It does not arise from the fact that a nuisance exists, but results from the circumstance that the equitable power of the court is necessary to protect the party from an injury for which no adequate redress can be obtained by an action at law, or its interference is necessary to suppress interminable litigation for the recovery of damages for an actionable wrong. As a condition to the exercise of that power, it is essential that the right shall be clearly established, or that it should previously have been determined by the action of the ordinary tribunals for the adjudication of the rights of the parties, and the injury must be such, in its nature or extent, as to call for the interposition of a court of equity." The same court held, in *Morris and Essex R. R. Co.* v. *Pruden*, 5 *C. E. Green* 530, that where there is an invasion of a public right, and there is an ample remedy by indictment, equity will not enjoin at the instance of the Attorney-General, unless there is pressing public necessity for its intervention. In *Att'y-Gen.* v. *Heishon*, 3 *C. E. Green* 410, this court (Chancellor Zabriskie,) said : " This court has no doubt power to cause nuisances to be abated ; nuisances to individuals, on bill, and public nuisances like this, on information. But it will only exercise that power when the fact of nuisance is beyond doubt, or has been settled by a verdict at law ; and where the nuisance is erected and complete, this court should not interfere without a trial at law, except, perhaps, in cases of irreparable mischief from its continuance, especially where there is a full and complete remedy at law." The like doctrine was declared by the Supreme Court of the United States, in *Mississippi and Missouri R. R. Co.* v. *Ward*, 2 *Black* 485. In that case application was made by bill in equity, to the District Court of the United States for Iowa, for a decree directing the removal of a bridge or viaduct built by the Mississippi and Missouri Railroad Company over the Mississippi river, from Rock Island, in Illinois, to Davenport, in Iowa, as having been erected in violation of law, and as an obstruction to the navigation, and a nuisance. The bill alleged that the

river was the boundary line, in whole or in part, of ten states, its importance as an avenue of commerce, and that its navigation was a necessity of trade, and almost the only means of transportation between Wisconsin, Northern Iowa, Minnesota, and the Upper Mississippi. It insisted that the right of free and unobstructed navigation in the river, and all parts of it, was secured by the treaties with France, in 1803, and the acts of Congress, and the universal principle recognized by the common law, and that the bridge was a nuisance in fact, imperiling navigation, and obstructing the stream. It alleged that the bridge was built by the company, with the aid and assistance of the Chicago and Rock Island Railroad Company, a company created for the purpose of erecting it, by the State of Illinois. It appears that the part of the bridge erected by the defendants was authorized by Iowa. In deciding the case on appeal, the Supreme Court of the United States held, that inasmuch as the removal of the three piers, between the middle of the river and the Iowa shore, would not materially remedy the nuisance complained of, though it would render the bridge useless, that court would not affirm a decree ordering such removal; and that the rule of the law is that where a bridge over a navigable stream is erected for public purposes, and produces a public benefit, and leaves reasonable space for the passage of vessels, it is not indictable; and that another rule is, that the bridge must appear plainly to be a nuisance before it can be so decreed, since a court of equity proceeding by bill, like a criminal court trying an indictment, must give the defendant the benefit of all reasonable doubts.

In the case before me, there is no purpresture; the structure, which is for a public purpose, and for the public advantage, is completed. It creates no impediment to the navigation of the river. It has been built *bona fide,* and there is cogent evidence of acquiescence on the part of the state in the construction which the defendants have put upon the law under which they have acted. Under such circumstances, an injunction will not be granted. *Att'y-Gen.* v. *N. J. R. R. & T. Co.,* 2 *Green's C. R.* 136; *Allen* v. *Chosen Freeholders,* 2 *Beas.*

68; *Att'y-Gen.* v. *N. Y. & L. B. R. R. Co.*, 9 *C. E. Green*
49; *City of Georgetown* v. *Alexandria Canal Co.*, 12 *Peters*
93, 98; *Att'y-Gen.* v. *United Kingdom Electric Tel. Co.*, 30
*Beav.* 287; *Att'y-Gen.* v. *Eastern Counties Railway Co.*, 7
*Jur.* 806.

The order to show cause will be discharged.